UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VEGAS BRAY,<br><br>　　　　　　　　　　Petitioner,<br><br>v.<br><br>J. ESPINOZA, Warden,<br><br>　　　　　　　　　　Respondent. | Case No.: 18cv1169-JLS (MSB)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

　　　This Report and Recommendation is submitted to the United States District Judge Janis L. Sammartino pursuant to 28 U.S.C.A. § 636(b) (West 2018) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.  On June 4, 2018, Petitioner, Vegas Bray, a state prisoner proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C.A. § 2254 (West 2019).  (Petition, ECF No. 1 ("Pet.").)  Petitioner challenges the validity of her state court conviction for first-degree murder.  (See id. at 2.)  Respondent answered on September 13, 2018.  (Answer, ECF No. 7-1 ("Answer").)  Petitioner did not file a Traverse, which was due on October 17, 2018.  (See Docket; see also ECF No. 10 at 3.)

1

This Court has considered the Petition, Answer, and all supporting documents filed by the parties. For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in People v. Bray, Appeal No. D069580. (See Lodgment 17.) This Court presumes the state court's factual determinations to be correct, absent clear and convincing evidence to the contrary. See 28 U.S.C.A. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

> At approximately 3:00 p.m. on October 16, 2012, Bray arrived at the apartment complex where her ex-boyfriend, Victor Saucedo, lived. Approximately 10 to 20 minutes later, a witness heard several gunshots. Sometime near the time that the witness heard the shots, Bray called her brother, Santiago R., told him that she loved him, and hung up. Santiago felt that something was wrong and repeatedly tried calling her back. On Santiago's third attempt, Bray answered. When Santiago asked her what was wrong, Bray responded, "I think I shot Victor." Soon thereafter, Bray said, "I shot him. I killed him. I think I killed him. He is dead." Bray told Santiago that she was going to kill herself. Santiago managed to talk her out of doing that, and persuaded her to call 911 to report what had happened. 911 dispatch received Bray's call at approximately 3:45 that afternoon. Bray told the dispatcher that Saucedo had been shot. When asked who shot him, she said, "I don't know. I'm not sure what happened."
>
> Saucedo was dead when officers arrived at the scene, and the medical examiner's office was called. Saucedo had sustained nine gunshot wounds to his body—three to his face, one to his right shoulder, one to his right chest, one to his right back, one to his right hand, one to his left shoulder, one to his lower chest, and one to his abdomen. Multiple shots had been fired at close range, and several of the wounds were or could have been independently fatal. Bray had used hollow point ammunition, which "is designed to sort of open up and flatten when it enters the body." In opening up and flattening when entering the body, hollow point

ammunition "transfers more of its energy in terms of its speed to the body" than standard ammunition.

Bray told detectives that she blacked out while driving on the freeway on her way to pick up a friend and go to a gym. She explained that when she woke up, she was lying on the floor, and approximately a foot or two away from her was Saucedo's body. She saw her gun, ammunition, and purse nearby.[1] Bray's ears were ringing. Bray told detectives that she called 911, but did not explain to the dispatcher about "waking up" because she "didn't know how to explain any of that to them."

Evidence presented at trial provided context and background regarding Bray and Saucedo's relationship in the time period leading up to Saucedo's killing. Bray and Saucedo had developed a romantic relationship in 2011. They broke up near the end of that year, but continued a friendship. Between the time of their breakup and Saucedo's killing, Bray had been prone to bouts of jealousy and behaved inappropriately toward Saucedo. For example, Bray slashed the tires on Saucedo's car on two occasions, keyed his car, threw a jar of jelly through Saucedo's living room window, and threw paint and eggs at Saucedo's front door. Saucedo moved to a different unit in his apartment complex after these events occurred. Bray slashed Saucedo's tires another time in June 2012. In August and September 2012, Bray spoke with the property manager at the apartment complex where Saucedo lived and indicated that she was looking to rent an apartment in that complex.

In the months leading up to Saucedo's death, Bray recorded statements that suggested she was having violent thoughts directed at Saucedo. In May 2012, Bray created a file on her computer titled "bucket list." Included on her "list" were plans to "buy a gun," "find Victor Saucedo," "kill him," and then kill herself. On August 3, 2012, Bray wrote a memo on her cell phone regarding Saucedo in which she complained about Saucedo cheating on her. Bray ended the memo with the following: "'He was so full of shit and lies. I said "was" 'cause this dumbass no longer exists. Goodbye, Victor C. Saucedo. U stupid ass fuckin' bitch.'" On October 5, 2012, Bray wrote another memo on her cell phone: "'Just say that she was obsessed with killing him.'"

---

[1] Bray purchased the gun in August 2012, just a couple months prior to the Saucedo's killing. She told detectives that she kept the gun in a locked case inside the trunk of her vehicle. She kept ammunition in the glove compartment of her vehicle.

3

> On October 15, 2012, the night before Saucedo was killed, Bray drove to Saucedo's apartment. Bray and Saucedo had sex. The next morning, Bray asked Saucedo if he wanted to have breakfast with her, but he declined. Bray was "shocked." She was angry with Saucedo and with herself, and felt "ashamed." Bray then spent some time with her brother, Santiago, at the DMV. Bray seemed normal to Santiago at the time. Just after 3:00 p.m. on October 16, 2012, Bray was seen walking through Saucedo's apartment complex. Approximately 10 to 20 minutes later, shots were heard in the apartment complex.
>
> At trial, Bray's defense was that she suffered from posttraumatic stress disorder and other mental disorders that caused her to be in "an altered state of consciousness" on the day she shot Saucedo. A psychiatrist who testified on Bray's behalf explained her state of mind at the time of the shooting as involving "a disassociated state, a post traumatic state in which she was not in control of her actions. She was in control of some of her actions obviously. She was able to drive and do routine things, but this was in an automatic way, not a conscious choice way that she was, so to speak, on auto pilot in a rage state."

(Lodgment 17 at 2-5.)

On October 19, 2012, Petitioner was charged with one criminal count of murder, in violation of California Penal Code section 187(a), with a special allegation that she personally and intentionally discharged a firearm, proximately causing great bodily injury or death, in violation of California Penal Code section 12022.53(d). (Lodgment 11 at 1-3.) On November 2, 2015, a jury found Petitioner guilty of first-degree murder, in violation of California Penal Code sections 187/189, and found true the allegation that she had personally and intentionally discharged a firearm, proximately causing great bodily injury or death, in violation of California Penal Code section 12022.53(d). (Lodgment 9 at 996.) On January 8, 2016, the trial court sentenced Petitioner to an indeterminate term of fifty years to life in state prison. (Lodgment 10 at 1020-21; see also Lodgment 12 at 211-12; Lodgment 17 at 5.)

On July 11, 2016, Petitioner filed an appeal in the California Court of Appeal, arguing that the trial court prejudicially erred in not properly instructing the jury on the

lesser included offense of involuntary manslaughter. (Lodgment 14.) On April 4, 2017, the California Court of Appeal affirmed the trial court's judgment in a written opinion. (Lodgment 17.)

Petitioner subsequently filed a petition for review in the California Supreme Court, raising the same claim that she raised in her appeal to the California Court of Appeal. (See Lodgment 18; see also Lodgment 14.) On June 14, 2017, the California Supreme Court denied the petition without comment or citation to authority. (Lodgment 19.) On June 4, 2018, Petitioner filed the instant Petition for Writ of Habeas Corpus ("the Petition"), arguing that the trial court committed prejudicial error by failing to properly instruct the jury on the lesser included offense of involuntary manslaughter. (See Pet. at 2, 6, 25-41.)

## II. SCOPE OF REVIEW

Title 28 of the United States Code, § 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a).

The instant Petition was filed after April 24, 1996, and therefore is subject to the Anti-terrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub.L. No. 104-132, 110 Stat. 1214. Under 28 U.S.C.A. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court's decision is an "unreasonable application" of clearly established federal law where the state court "identifies the correct governing legal rule [from Supreme Court decisions] . . . but unreasonably applies [that rule] to the facts of the particular state prisoner's case." White v. Woodall, 572 U.S. 415, 425 (2014) (quoting Williams, 529 U.S. at 407-08). In deciding a state prisoner's habeas petition, a reviewing federal court need not decide whether the state court applied clearly established federal law erroneously or incorrectly; rather a federal court applies an extraordinarily deferential review, inquiring only whether the state court's decision was "objectively unreasonable." See Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

When a state supreme court does not provide any explanation for its decision, the reviewing federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); see also Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (providing that a reviewing federal court may look through to the last reasoned state court

6

decision). Where a state court summarily denied a claim, a presumption exists that the state court adjudicated the claim on the merits, unless "there is reason to think some other explanation for the state court's decision is more likely." Harrington v. Richter, 562 U.S. 86, 99-100 (2011). If the state court provided no explanation for its decision, a reviewing federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

Habeas relief is also available where the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(2); see also Wood v. Allen, 558 U.S. 290, 293 (2010). Federal habeas courts give deference to a state court's application of state law and interpretation of the facts. See Estelle v. Maguire, 502 U.S. 62, 67-68 (1991); Lewis v. Jeffers, 497 U.S. 764, 780-81 (1990). A reviewing federal court will not overturn a state court's decision on factual grounds unless the federal court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El, 537 U.S. at 340; see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. See 28 U.S.C.A. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007).

### III. DISCUSSION

In her only ground for relief, Petitioner claims that the trial court committed prejudicial error by failing to properly instruct the jury on the lesser included offense of involuntary manslaughter. (See Pet. at 2, 6, 25-41.) Specifically, she alleges that the trial court instructed the jury with a "self-created instruction that omitted all of the

7

elements of the crime." (Id. at 25-26.) Petitioner contends that "[t]his was reversible error as the jury was given no instruction as to how to determine whether [Petitioner] should be convicted of involuntary manslaughter, as a lesser included offense of murder." (Id. at 26.)

Respondent argues that Petitioner's claim is not a cognizable federal claim, and that the Petition should thus be denied. (See Answer at 11-12.) Respondent also contends that despite being given the options to convict Petitioner of first-degree murder, second degree murder, voluntary manslaughter, or involuntary manslaughter, the jury found that Petitioner had the requisite express malice and premeditation sufficient to convict her of first-degree murder. (See id. at 14-16.) Respondent therefore maintains that the state appellate court's rejection of Petitioner's claim was reasonable and habeas relief should be denied. (See id. at 11-16.)

Petitioner presented her instructional error claim to the California Supreme Court in a petition for review, which was summarily denied without a statement or reasoning or citation of authority. (See Lodgments 18 and 19.) Petitioner presented this claim to the California Court of Appeal. (See Lodgment 14.) The state appellate court denied the claim in a reasoned opinion. (Lodgment 17.) The Court will therefore look through the silent denial by the state supreme court to the appellate court's opinion. See Wilson, 138 S. Ct. at 1192; Ylst, 501 U.S. at 804 n.3.

The California Court of Appeal affirmed the trial court's judgment and stated the following:

> Bray contends that the trial court erred in instructing the jury with respect to involuntary manslaughter by omitting those portions of CALCRIM No. 580 set forth immediately above, particularly the portion that sets forth the elements of that offense and explains the meaning of "criminal negligence." We need not determine whether the trial court's modified instruction regarding involuntary manslaughter was erroneous or not, however, because even if we presume that it was erroneous, Bray cannot demonstrate that she suffered prejudice as a result of the instruction.

8

> An erroneous failure to give a lesser-included-offense instruction results in reversal of a conviction only if the error is prejudicial. (People v. Blakeley (2000) 23 Cal.4th 82, 93.) As Bray acknowledges, claims of instructional error with respect to a lesser included offense are reviewed under the harmless-error-review standard of People v. Watson (1956) 46 Cal.2d 818, 836. (People v. Rogers (2006) 39 Cal.4th 826, 867-868 (Rogers).) Under this standard, reversal is required only if it is reasonably probable that the jury would have returned a different verdict absent the error or errors about which the defendant is complaining. (Ibid.)
>
> It is not reasonably probable that the jury would have returned a different verdict absent the claimed instructional error with respect to involuntary manslaughter. The jury was given the option of convicting Bray of first degree murder, second degree murder, voluntary manslaughter based on an unlawful killing committed in the heat of passion, and involuntary manslaughter. The jury convicted Bray of first degree murder, finding that she premeditated the killing and acted with express malice. In doing so, the jury necessarily rejected the lesser included offenses of implied malice second degree murder and heat-of-passion voluntary manslaughter, both of which require higher degrees of culpability than does the offense of involuntary manslaughter. In such a circumstance, there is no reasonable probability that, if the jury been [sic] instructed on involuntary manslaughter in the manner in which Bray asserts it should have been, the jury would have chosen to convict her of that offense.

(Lodgment 17 at 8-9.)

To the extent that Petitioner claims that the state trial court violated state law when it did not properly instruct the jury on the lesser included offense of involuntary manslaughter, the claim is not subject to federal habeas review. Estelle, 502 U.S. at 67-68 (citations omitted) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' . . . [I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). "Federal habeas courts . . . do not grant relief, as might a state appellate court, simply because [an] instruction may have been deficient in comparison to the [California Jury Instructions–

9
18cv1169-JLS (MSB)

Criminal] ["CALJIC"]² model." Id. at 72. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68; see also 28 U.S.C.A. § 2254(a); Hernandez v. Ylst, 930 F.2d 714, 719 (9th Cir. 1991) (a petitioner must allege that the state court violated his or her federal constitutional rights for a claim to be cognizable on federal habeas corpus review).

To the extent that Petitioner contends that the trial court's alleged failure to properly instruct the jury on the lesser included offense of involuntary manslaughter violated her federal constitutional rights, the Court will consider the claim. There is no clearly established federal law on this issue, however, because the United States Supreme Court expressly declined to rule on whether a trial court's failure to instruct on a lesser included offense in a non-capital case violates the federal constitution. See Beck v. Alabama, 447 U.S. 625, 638 n.14 (1980); see also Powell v. Hatcher, 407 F. App'x. 226, 227 (9th Cir. 2011) (denying habeas relief and noting that in Beck, the Supreme Court expressly declined to rule on the issue); United States v. Rivera–Alonzo, 584 F.3d 829, 834 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases."). Habeas relief is not available to Petitioner on this claim because the Court cannot find that the state appellate court "unreasonabl[y] appli[ed] . . . clearly established Federal law, as determined by the Supreme Court of the United States." See 28 U.S.C.A. § 2254(d); see also Beck, 447 U.S. at 638 n.14.

---

² "In 2005, the Judicial Council of California adopted the CALCRIM; pursuant to Rule 2.1050 of the California Rules of Court, CALCRIM 'are the official instructions for use in the state of California.'" United States v. Vidal, 504 F.3d 1072, 1084 n.20 (9th Cir. 2007).

Under certain circumstances, a district court can find reversible error in the state court's instructions. In the context of a trial court's failure to give an instruction on a theory of the defense, "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness . . . [which] require that criminal defendants be afforded a meaningful opportunity to present a complete defense." Bradley v. Duncan, 315 F.3d 1091, 1098–99 (9th Cir. 2002) (citing California v. Trombetta, 467 U.S. 479, 485 (1984)); see also Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quotation omitted) (state court's jury instructions violate due process if they deny the criminal defendant a "meaningful opportunity to present a complete defense"). "When habeas is sought under 28 U.S.C. § 2254, '[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable.'" Clark, 450 F.3d at 904-05 (quotation omitted); see also Hopper v. Evans, 456 U.S. 605, 611 (1982) ("[D]ue process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction.").

"A habeas petitioner must show that the alleged instructional error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Clark, 450 F.3d at 905 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). As a result, the burden on a habeas petitioner is especially heavy in claims of a state court's failure to give a lesser included instruction, because the issue to be examined is whether "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also Clark 450 F.3d at 904. Accordingly, in this case, habeas relief is unavailable to Petitioner, unless the trial court's jury instructions denied Petitioner "a meaningful opportunity to present a complete defense," and therefore violated her due process rights.

During Petitioner's trial, the trial judge gave the jury options to convict or acquit Petitioner of first-degree murder, second-degree murder, voluntary manslaughter, and

involuntary manslaughter. (See Lodgment 8 at 874-76.) The jury found that Petitioner was guilty of first-degree murder, in violation of California Penal Code sections 187/189.[3] (See Lodgment 9 at 996.) In California, convicting a defendant of murder requires the State to prove that the defendant acted "with malice aforethought." People v. Beltran, 56 Cal. 4th 935, 941 (2013) (citing Cal. Pen. Code § 187(a)). Malice aforethought may be either express or implied. People v. Elmore, 59 Cal. 4th 121, 132 (2014) (citing Cal. Pen. Code § 188). Express malice is defined in the California Penal Code as "a deliberate intention unlawfully to take away the life of a fellow creature." Id. "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." Id. at 133. Second degree murder is defined as "the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." Id. (quoting People v. Knoller, 41 Cal. 4th 139, 151 (2007)). Finally, "[m]anslaughter, a lesser included offense of murder, is an unlawful killing without malice." Id. (citing Cal. Pen. Code § 192; People v. Thomas, 53 Cal. 4th 771, 813 (2012)).

Petitioner argues that the trial court committed prejudicial error by failing to properly instruct the jury on the lesser included offense of involuntary manslaughter. (See Pet. at 2, 6, 25-41.) CALCRIM No. 580 defines involuntary manslaughter as follows:

> When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter.

///

---

[3] California Penal Code section 187(a) defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought." Cal. Pen. Code § 187(a). Section 189 further provides that murder that is perpetrated by any kind of willful, deliberate, and premeditated killing is murder of the first degree. Cal. Pen. Code § 189(a).

The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter.

The defendant committed involuntary manslaughter if:

1. The defendant committed (a crime/ [or] a lawful act in an unlawful manner);

2. The defendant committed the (crime/ [or] act) with criminal negligence;

AND

3. The defendant's acts caused the death of another person.

. . . .

<u>Criminal negligence</u> involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when:

1. He or she acts in a reckless way that creates a high risk of death or great bodily injury;

AND

2. A reasonable person would have known that acting in that way would create such a risk.

In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act.

CALCRIM No. 580.

///

13
18cv1169-JLS (MSB)

The trial court instructed the jury with the following modified version of CALCRIM No. 580:

> When a person commits an unlawful killing but does not intend to kill, then the crime is involuntary manslaughter.
>
> If the jury finds beyond a reasonable doubt the defendant's mental state had not lapsed into unconsciousness but finds beyond a reasonable doubt that at the time of the killing the defendant suffered from a mental disorder that rendered the defendant incapable of entertaining either malice aforethought or intent to kill, the offense can be no greater than involuntary manslaughter.

(Lodgment 12 at 171; see also Lodgment 8 at 872; Lodgment 7 at 805-08; 811.)

Although the modified instruction given by the trial judge appears to be less detailed than CALCRIM No. 580, in determining whether a given instruction was deficient, the instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). Petitioner's theory at trial was that leading up to and during the shooting, she dissociated as a result of her traumatic past and recent negative interactions with the victim, and that she was in an altered state of consciousness as a result of this dissociation. (See Lodgment 8 at 892-33, 895-97, 911-12, 927-28, 932-33, 938-55; see also Pet. 22-25; Lodgment 14 at 17-20.) In support of this theory, Petitioner called a psychologist, Dr. Alan Abrams, to testify about his discussions with Petitioner about her traumatic past, past dissociative episodes, and Dr. Abrams's diagnoses. (See Lodgment 5 at 466, 474-77, 485, 487-88, 494, 502-03, 539, 580-81.) Further, the prosecution's witness, a psychologist, Dr. Clark Clipson, testified that Petitioner "probably did dissociate during the act," and that "[d]issociating during a violent act is a very common experience." (See Lodgment 7 at 759.)

The trial judge told the parties that CALCRIM No. 580 inadequately addressed the defense theory of altered consciousness as a result of a mental disorder, so he

consequently modified CALCRIM No. 580 by incorporating language from CALCRIM No. 3425, as well as California case law, regarding unconsciousness. (See id. at 805-08, 811.)

Petitioner's counsel agreed with the trial court's proposed instruction's language. During the discussions at trial regarding the involuntary manslaughter instruction, Petitioner's counsel stated that she did not "have a huge quarrel with [the trial judge's] instruction" and that she "appreciate[d] the fact that [the trial judge] craft[ed] something with the Saille and stuff." (Id. at 812 (citing People v. Saille, 54 Cal.3d 1103 (1991)); see also id. at 814.) Petitioner's counsel also agreed with the trial judge that the defense theory was a "case-created defense," and that there was no CALCRIM instruction that dealt with their particular defense. (Id. at 811.)

Petitioner's theory that she dissociated as a result of her mental illness and therefore lacked the necessary capacity to commit murder appears to be explicitly addressed in the modified instruction's language: "If the jury finds beyond a reasonable doubt . . . the defendant suffered from a mental disorder that rendered the defendant incapable of entertaining either malice aforethought or intent to kill, the offense can be no greater than involuntary manslaughter." (Lodgment 7 at 872 (emphasis added).) During the closing argument, Petitioner's counsel argued that if the jurors did not find that Petitioner had a complete defense to murder based on unconsciousness, the jury had the option of convicting Petitioner not only of voluntary, but also of involuntary manslaughter. (Lodgment 8 at 949-50, 954.) Notably, Petitioner's trial counsel stated the following to the jury:

> I would submit I think it is required of you and incumbent on you based on the evidence and the law to come back with not guilty verdicts on all charges. But if there was any charge that you could come back, the only one based on the uncontroverted evidence from both the prosecution and the defense expert would be that involuntary manslaughter because if [Petitioner] is not all the way checked out, she is in such a confused state, overwhelmed, primal rage state, that she couldn't form the specific intent necessary of the other charges.

(Id. at 954.)

The prosecution argued to the jury that Petitioner planned the killing beforehand. (See id. at 878-91.) During Petitioner's trial, the prosecution presented evidence that included Petitioner's "bucket list" on her computer and Petitioner's memos on her cell phone. (See Lodgment 4 at 408-10; Lodgment 5 at 553-54.) In her "bucket list," Petitioner described how she planned to "buy a gun," "find Victor Saucedo," "kill him," and then kill herself. (Lodgment 5 at 553-54). In Petitioner's memos on her cell phone, she complained about the victim cheating on her, and stated the following: "He was so full of shit and lies. I said 'was' 'cause this dumbass no longer exists. Goodbye, Victor C. Saucedo. U stupid ass fuckin' bitch," and "Just say that she was obsessed with KILLING him." (Lodgment 4 at 408-10.)

As noted above, the trial judge instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. (See Lodgment 8 at 874-76.) The jury convicted Petitioner of first-degree murder. (See Lodgment 9 at 996.) Accordingly, even if the trial court erred by omitting a portion of the involuntary manslaughter jury instruction, the error was harmless, because there was no substantial or injurious influence on the jury's verdict. As the California Court of Appeal determined, there is no reasonable basis for assuming that, had the jury been instructed on involuntary manslaughter by a complete unmodified instruction, the verdict would have been different, given that the jury found that Petitioner premediated the killing and acted with express malice. See Williams-Cook v. Yates, No. 09–CV–2643–H (AJB), 2010 WL 3768113, at *5–7 (S.D. Cal. Sept. 21, 2010) (denying petitioner's instructional error claim, where petitioner argued that the trial court erred by giving a modified version of CALCRIM No. 580, and that the jury may have felt compelled to convict petitioner of second degree murder rather than acquit him due to a partial omission in the jury instruction defining involuntary manslaughter; noting that "[t]he jury found that [p]etitioner had acted with implied malice, which meant that there was no reasonable probability that the jury would have convicted [p]etitioner of involuntary manslaughter even if the omitted section of the lesser included offense

16

instruction had been given."); see also Barao v. Frauenheim, No. 2:15-cv-00098-JKS, 2016 WL 146235, at *8-9 (E.D. Cal. Jan. 13, 2016) (denying petitioner's instructional error claim, where the trial court instructed the jury with first and second degree murder, but not voluntary manslaughter; noting that "any purported error in not giving the involuntary manslaughter instruction was harmless" because "there is no reasonable basis for assuming that, had the jury been instructed on the involuntary manslaughter theory, the verdict would have been any different, given that the jury, in determining that petitioner committed second degree murder, implicitly rejected any theory of involuntary manslaughter.").

Under the facts presented here, the modified jury instruction given by the trial judge did not "so infect[] the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72. Accordingly, the California Court of Appeal's denial of the Petitioner's jury instruction claim was neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1). Further, based on review of the entire record, the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. See 28 U.S.C. § 2254(d)(2). The Court therefore **RECOMMENDS** that Petitioner's sole claim for relief be **DENIED**.

## IV. CONCLUSION AND RECOMMENDATION

For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that no later than **February 28, 2020**, any party to this action may file written objections with this Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

///

///

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **March 23, 2020**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated: January 31, 2020

_____
Honorable Michael S. Berg
United States Magistrate Judge